### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 2:11-cr-63-GZS** |
| | ) | |
| **CURTIS SIMMONS,** | ) | |
| | ) | |
| **Defendant** | ) | |

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

Curtis Simmons, indicted on one charge of knowingly and intentionally conspiring with other persons to distribute and to possess with intent to distribute a mixture or substance containing oxycodone, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and one count of knowingly and intentionally possessing with intent to distribute a mixture or substance containing oxycodone, in violation of 21 U.S.C. § 841(a)(1), *see* Superseding Indictment (Docket No. 44), seeks to suppress evidence seized and observations made by law enforcement officers executing a search warrant at 923 West Road in Belgrade, Maine, on August 20, 2010, as well as statements that he made to officers that day. *See* Motion To Suppress Evidence ("Motion") (Docket No. 66) at 1, 6-7.

An evidentiary hearing was held before me on February 8, 2012, at which the defendant appeared with counsel. The government tendered one witness and offered eight exhibits, all of which were admitted without objection. The defendant called one witness and offered three exhibits, all of which were admitted without objection. After both sides rested, counsel for each

argued orally. I now recommend that the following findings of fact be adopted and that the Motion be denied.[1]

## I. Proposed Findings of Fact

On August 20, 2010, Maine Drug Enforcement Agency ("MDEA") agent Lincoln Ryder and other law enforcement officers searched the premises of Robert Simon at 923 West Road in Belgrade, Maine, pursuant to a warrant issued the prior day by a Maine District Court judge. *See* Gov't Exh. 2. The warrant authorized the daytime or nighttime search of the mobile home at 923 West Road, the person of Robert Elmer Simon, any outbuildings located at 923 West Road, any people present there during the execution of the search warrant, and any vehicles under the control of Robert Simon, including a black sport utility vehicle ("SUV"). *See id*. The warrant authorized agents to seize any and all scheduled drugs, including but not limited to marijuana and prescription pills, as well as other items pertaining to alleged unlawful trafficking in controlled substances, including books and records, money, paraphernalia, tools, and cellular phones. *See id*. In support of his application for the issuance of the warrant, Ryder submitted an affidavit in which he stated, in relevant part:

1.      During the first week of August 2010, Supervisory Special Agent Chip Woodman informed Ryder that he had received information from a concerned citizen, "CC," about drug activity flowing through Tampa, Florida, Boston, Massachusetts, and Belgrade, Maine. Affidavit of Lincoln E. Ryder ("Ryder Aff."), Gov't Exh. 1, § III, ¶ 3. Woodman relayed the following to Ryder. *Id*.

---

[1] At the outset of the hearing, the defendant made an oral motion to continue the hearing. I denied it for the reasons stated on the record.

a. The CC reported that he/she had met "Bob Simons" and his son, believed to be "Curtis Simons," at a bar in Hallowell from which Bob and Curtis sell prescription medication for $20 per pill. *Id.* ¶ 3(a).

b. The CC stated that he/she had been to Bob and Curtis's residence in Belgrade, which he/she described as a mobile home parallel to the road with a locked gate and a camper behind it. *Id.* ¶ 3(b). The CC provided directions that Woodman confirmed led to premises fitting that description at 923 West Road in Belgrade. *Id.* The CC stated that he/she had seen Curtis with a mason jar containing marijuana and that both men had told him/her that there were marijuana plants growing behind the trailer. *Id.* ¶ 3(c).

c. The CC reported that Curtis and Bob had told him/her that they drive back and forth from Tampa, Florida, and that the CC had observed Bob and Curtis collect money from a male at an apartment building complex behind Target in Augusta, Maine, during the fourth week of July 2010. *Id.* ¶¶ 3(d)-(e). The CC indicated that Bob and Curtis told him/her that they planned to go next to Haverhill, Massachusetts, where CC believed that they planned to purchase pills for resale in Maine. *Id.* ¶ 3(e). The CC reported that Bob and Curtis travel in an SUV with Florida license plates and a lot of lights. *Id.* ¶ 3(f). He/she provided phone numbers for both Bob and Curtis, stated that they were staying Maine for another week, and reported that Curtis bragged about buying a truck for $7,000 in cash. *Id.* ¶ 3(f). The CC said that Bob was an inmate in Tampa, Florida, and that he/she had seen Bob's inmate identification. *Id.*

d. The CC had no criminal history, no pending charges, and was providing information to assist law enforcement of his/her own accord. *Id.* ¶ 3(g).

2.      On August 12, 2010, Woodman drove Ryder and special agents John Richards and Duane Cloutier to 923 West Road in Belgrade.  *Id.* ¶ 4.  Ryder, Richards, and Cloutier walked into the wooded area north of 923 West Road to an area in the woods overlooking the rear of the trailer.  *Id.*  At that time, the gate was closed, and no one appeared to be at the trailer. *Id.*  Ryder and the other agents observed, at the rear of the trailer (about 20 to 30 feet behind it), a fenced-in area that contained what Ryder recognized, based on his experience investigating other marijuana grows, as approximately eight growing marijuana plants about two to three feet tall. *Id.*  Ryder observed, outside of the fence, a rake, a watering can, and a five-gallon bucket, presumably used for maintaining the marijuana plants.  *Id.*  Ryder took a photograph of the plants, included as Figure 3 in his affidavit, with a digital camera in his cellular telephone.  *Id.*

3.      Later on August 12, 2010, Ryder learned from Detective Chris Blodgett of the Augusta Police, who is also a resident special agent with the MDEA, that Blodgett had received information about a male selling prescription medication (pills) in Belgrade and a related male in Augusta involved in the sale of prescription medication.  *Id.* ¶ 5.  In that conversation, and in follow-up conversations with Ryder on August 18 and 19, 2010, Blodgett relayed the following regarding Confidential Source 1 ("CS-1"), whom Blodgett had debriefed on August 6, 2010, regarding his/her drug suppliers.  *Id.* ¶ 5(a).

a.      The people from whom CS-1 was buying drugs, 80 mg Oxycontin pills and 30 mg Percocet pills, were getting them from a male in the Belgrade area who lived in a trailer that could be located if one followed certain directions that CS-1 provided.  *Id.* ¶ 5(a)(i).  Blodgett followed those directions, which took him to 923 West Road in Belgrade.  *Id.*  Blodgett observed a trailer, a large "farm style" gate blocking the driveway, and no vehicles in the yard.  *Id.*

b.      CS-1 also told Blodgett that (i) the male supplier in Belgrade made weekly or biweekly trips to Florida and brought back 3,000 to 6,000 pills that were a mixture of 80 mg Oxycontin and 30 mg Percocet, (ii) the supplier then distributed those pills to his dealers, from whom CS-1 had purchased pills in the past, (iii) the supplier drove a dark-colored Yukon or Tahoe SUV with black chrome rims and some unidentified stickers in the rear window, (iv) on one occasion, CS-1 was at the supplier's residence in Belgrade and saw what CS-1 estimated were approximately 10,000 pills on a tray, which he/she described as a mixture of 30 mg Percocet pills and 80 mg Oxycontin pills, and (v) the supplier in Belgrade worked with another male drug dealer known as Kurt or Kirk, believed to live in Augusta, Maine. *Id*. ¶¶ 5(a)(ii)-(vi).

c.      CS-1 stated that he/she had been out of the drug scene for approximately four months. *Id*. ¶ 5(a)(vii). According to Blodgett, CS-1 had no pending criminal charges. *Id*. ¶ 5(a)(viii). Ryder verified on August 19, 2010, that CS-1 had no criminal convictions. *Id*. CS-1 was providing information to assist law enforcement in drug investigations in an attempt to remain drug-free. *Id*. ¶ 5(a)(ix).

4.      In conversations with Blodgett in August 2010, Ryder also learned that:

a.      On August 12, 2010, Blodgett debriefed Confidential Source 2 ("CS-2"), who provided information about the supplier described by CS-1, from whom he/she had purchased drugs in the past. *Id*. ¶ 5(b). CS-2 referred to this drug distribution group as "The Jersey Crew." *Id*. ¶ 5(b)(i). CS-2 advised that he/she knew of a male named Kirk who lived on Capitol Street in Augusta and who was making biweekly trips to Florida. *Id*. ¶ 5(b)(ii). Ryder spoke with Woodman on August 19, 2010, and Woodman said that

the apartment complex that had been described by CC was believed to be the same complex described by CS-2 as Kirk's residence. *Id.* ¶ 5(b)(ix).

b. CS-2 stated that, during three-day trips, Kirk flew to Florida, took a bus back to Maine, and brought back 3,000 to 5,000 30 mg Percocet pills. *Id.* ¶ 5(b)(ii). CS-2 said that Kirk purchased the pills for $6 to $7 per pill and, upon returning from Florida, fronted the pills to people dealing pills for him, expecting $15 per pill. *Id.* ¶ 5(b)(iii). Dealers then sold the pills for between $25 and $35 per pill. *Id.* CS-2 relayed that Kirk was known to have fully automatic firearms and was an older male and a veteran. *Id.* ¶¶ 5(b)(iv)-(v).

c. CS-2 told Blodgett that he/she had not seen Kirk or others related to the drug trade for two to three weeks. *Id.* ¶ 5(b)(vi). According to Blodgett, CS-2 had no pending criminal charges. *Id.* ¶ 5(b)(vii). Ryder checked CS-2's criminal history, finding that he/she had convictions for assault, criminal trespass, operating under the influence, operating after suspension, and violation of conditions of release. *Id.*

d. CS-2 was providing information to assist law enforcement in drug investigations. *Id.* ¶ 5(b)(viii).

5. Between August 12 and 18, 2010, Ryder and other agents drove by the suspect residence several times to determine if anyone had returned to the trailer. *Id.* ¶ 6. On August 18, 2010, at about 1:10 p.m., Ryder observed that the gate was open and that there were two vehicles in the driveway, one of which appeared to be an SUV or van, and someone was standing outside at the front door of the trailer, facing the road. *Id.*

6. On August 18, 2010, Ryder conducted records checks to attempt to learn more about "Bob and Curtis Simons." *Id.* ¶ 7. He was unable to find any information about Curtis

Simons, but located information about Robert Elmer Simon from Tampa, Florida, date of birth 1971. *Id*. Stacey Miller, also of Tampa, Florida, was listed as a relative of Bob Simon. *Id*. Ryder determined that the telephone number provided to Woodman by CC for "Bob" was listed as a possible cell phone number for Stacey Miller. *Id*.

7. Ryder contacted the Tampa, Florida, Police Department and inquired about Robert and Curtis Simons. *Id*. ¶ 8. The police department had no records for Curtis but located arrest records for Robert, directing Ryder to a Hillsborough County, Florida, Sheriff's Office web site on which Ryder located Robert's arrest records and downloaded a photograph of him, included as Figure 2 in the affidavit. *Id*. On August 19, 2010, Ryder noticed that the Next of Kin field on the web site containing Robert's arrest records was redacted. *Id*. ¶ 8(a). On that date, he contacted the Hillsborough County Sheriff's Office and learned that those records listed Stacey Miller as Robert's next of kin and/or wife. *Id*.

8. Ryder conducted a check for criminal records for Robert Simon, determining that he had an extensive record of arrests, many for drug related offenses, including possession of cannabis, possession of drug paraphernalia, and possession of a controlled substance. *Id*. ¶¶ 2, 9.

9. On August 19, 2010, at about 11:30 a.m., Ryder and Detective Sergeant Michael Benecke of the Waterville Police Department drove by 923 West Road in Belgrade and observed a white female with brown hair in the front yard of the residence. *Id*. ¶ 10. Parked facing the trailer in the yard was a large black SUV that appeared to be a Chevy Tahoe or GMC Yukon with stickers on the rear window, corroborating the description provided by CS-1 to Blodgett. *Id*. Ryder took video footage of the yard and attached a screen shot as Figure 4 in his affidavit. *Id*.

10. On August 19, 2010, Ryder spoke with Detective Wade Turner of the Tampa, Florida, Police Department Narcotic Division. *Id.* ¶ 11. Turner explained that the Tampa Police Department had no current drug intelligence on Robert Simon but that Simon had been charged by that police department with possessing marijuana on two occasions, three grams and 19 grams, respectively, and with possession of Xanax prescription medication. *Id.* Turner explained that Stacey Miller was listed as Simon's next of kin in the department's arrest records, and sent Ryder a photo of Miller. *Id.*

11. Ryder stated that, based on this information, he believed that there was probable cause to conclude that Robert Elmer Simon was engaged in the cultivation of marijuana and the trafficking, furnishing, and/or possession of scheduled drugs, namely marijuana, prescription medication, and other scheduled drugs. *Id.* ¶ 12.

The purpose of the agents' surveillance on August 12, 2010, was to attempt to corroborate CC's report that there were marijuana plants in back of the residence at 923 West Road. Ryder, Richards, and Cloutier walked through an area of open woods north of 923 West Road to a spot within those woods from which they could see the back of the residence and from which Ryder could observe, with his naked eye, a grouping of marijuana plants.[2]

The residence at 923 West Road is surrounded by a cleared area, the outer perimeter of which is lined, at least in part, by boulders. The marijuana plants were located about 20 to 30 feet from the back of the residence, against a back corner of the cleared area. They were not visible from the road. Ryder photographed the marijuana plants, the location of which he marked at hearing with a circle on Gov't Exh. 4, from an area in the woods, the location of which he marked at hearing with an "X" on Gov't Exh. 4. *See* Gov't Exh. 4. He took the photograph

---

[2] The woods were "open" in that, while there was a great deal of foliage, the trees and branches were far enough apart that Ryder could easily walk through them.

included as Figure 3 in his affidavit, placed in evidence at hearing as Gov't Exh. 3, using the zoom feature on the digital camera in his cell phone. *See* Gov't Exh. 3. At that time, he was standing approximately 50 to 100 feet away from the marijuana plants. From the same vantage point, he took a second photograph placed in evidence as Df't Exh. 3. *See* Df't Exh. 3. In Gov't Exh. 3, a tree trunk and the top of a rock are visible in the left forefront of the photograph. *See* Gov't Exh. 3. In Df't Exh. 3, there is neither a tree trunk nor a rock visible in the foreground. *See* Df't Exh 3. Ryder explained that this was so because he used a higher level of zoom to take that photograph. Ryder did not recall at exactly what level of zoom he took either photograph. Ryder estimated that he was standing approximately 30 feet away from the rock shown in Gov't Exh. 3, and that the marijuana plants were probably another 15 to 20 feet away from the rock.[3]

During the agents' walk through the woods to reach the area from which Ryder took the photographs, Ryder saw no outbuildings or other structures. The only landmark within the woods that he could recall seeing was a rock wall, over which he climbed on both entering and departing the woods. The only structures that he observed were in the cleared area surrounding the residence. Ryder did not walk past any of the boulders surrounding the edge of the cleared area to take photographs. At no point on August 10, 2010, did Ryder or the two agents who accompanied him walk into the cleared area surrounding the residence. Ryder was mindful of

---

[3] The government submitted, as a demonstrative exhibit, a set of two photographs taken by Ryder from a wooded area of a different property, a barn, using the same cell phone camera zoom feature that he used to take the photograph submitted as Figure 3 in his affidavit. *See* Gov't Exh. 5. Using a Google Earth measurement program, Ryder determined that he was standing approximately 89 yards away from the barn when he photographed it. *See* Gov't Exh. 7. The larger photograph in Gov't Exh. 5 was taken without using the zoom feature, while the smaller one was taken using the maximum zoom of which Ryder's camera is capable. *See* Gov't Exh. 5. Ryder was standing in the same spot when he took both photographs. Ryder testified that, the closer one zooms in on a subject, the more distorted and the less detailed a photograph is.

avoiding stepping into the cleared area both because he wished to avoid detection and because he was aware that it is improper to encroach upon the curtilage of a property.[4]

Anthony Quatrano, a private investigator, was engaged by the defendant's counsel to perform private investigation work in the defendant's case. In April 2011, he traveled with the defendant's counsel to 923 West Road in Belgrade and took photographs of the area in which the marijuana had been growing. *See* Df't Exhs. 1, 2. When taking the photographs, Quatrano was within the cleared area of the yard, about 15 to 18 feet away from the area where the plants were growing. The woods were about 18 to 20 feet behind him as he took the shots, and there were no woods between himself and his subject. Quatrano testified that, given the differences between Df't Exh. 1 and Gov't Exh. 3, specifically the differences in the angle of the shot and the appearance of the second boulder to the left in relation to the tree behind it, Ryder must have been standing to the right of where Quatrano stood, more squarely facing the marijuana patch, when Ryder took the photograph marked as Gov't Exh. 3.

## II. Discussion

The defendant argues that (i) Ryder illegally made observations of marijuana plants from within the curtilage of 923 West Road and, (ii) with the illegally obtained information and photograph expunged from Ryder's affidavit, the affidavit fails to convey probable cause for the issuance of the warrant, requiring the suppression of evidence seized, observations made, and statements elicited as a result of the execution of the warrant. *See* Motion at 3-6. During oral argument, the defendant's counsel declined to concede that, if the challenged information and

---

[4] Ryder plausibly testified that, although the gate to the residence was closed and there were no vehicles in the driveway, he remained concerned about possible detection because of the presence of the watering can and other garden utensils, suggesting that someone might be tending to the plants.

photograph were not excised, the Ryder affidavit conveyed probable cause for the issuance of the warrant.

The government rejoins that (i) the marijuana plant information was lawfully obtained, (ii) alternatively, even with that information expunged, the Ryder affidavit conveys probable cause for the issuance of the warrant, and, (iii) alternatively, the so-called *Leon* good-faith exception applies. *See* Government's Objection to Defendant's Motion To Suppress Evidence ("Objection") (Docket No. 79) at 6-13; *see also United States v. Leon*, 468 U.S. 897, 922-25 (1984).[5]

A defendant bears the burden of proving the illegality of a warrant; if he or she succeeds, the burden shifts to the government to prove entitlement to the *Leon* good-faith exception. *See, e.g., United States v. Longmire*, 761 F.2d 411, 417 (7th Cir.1985) ("The general federal rule on who bears the burden of proof with respect to an allegedly illegal search or seizure is based upon the warrant-no warrant dichotomy: If the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality; if the police acted without a warrant, the prosecution bears the burden of establishing legality."); *see also, e.g., United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002) ("If a defendant is successful in establishing the invalidity of the search warrant, the burden then shifts to the Government to establish that the police relied in good faith on the judge's decision to accept the affidavit and issue the warrant.").

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed – the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched – the so-called 'nexus' element." *United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir. 2005) (citation and internal quotation marks omitted). Both the issuing

---

[5] Although, in its papers, the government merely reserved the right to present a *Leon* argument, *see* Objection at 13 n.3, its counsel did present such an argument at hearing.

magistrate and a subsequent reviewing court look to "the totality of the circumstances indicated [within the four corners of] a supporting affidavit" to assess the existence *vel non* of probable cause. *United States v. Schaefer*, 87 F.3d 562, 565 (1st Cir. 1996). "Yet such review cannot start from scratch. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Id*. (citation and internal quotation marks omitted).

"In determining whether the nexus element is satisfied, a magistrate has to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Ribeiro*, 397 F.3d at 48-49 (citation and internal punctuation omitted). "Put differently, the application must give someone of reasonable caution reason to believe that evidence of a crime will be found at the place to be searched." *Id*. at 49 (citation and internal quotation marks omitted).

"[W]hen faced with a warrant containing information obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause." *United States v. Dessesaure*, 429 F.3d 359, 367 (1st Cir. 2005); *see also, e.g., United States v. Woodward*, 173 F. Supp.2d 64, 67 (D. Me. 2001), *aff'd*, 43 Fed. Appx. 397 (1st Cir. 2002) ("When a court reviews an affidavit from which unconstitutionally seized evidence has been excised, it must independently determine if such probable cause remains within the affidavit that a neutral magistrate would have issued the subject warrants.") (citation omitted).[6]

---

[6] The First Circuit has left open the question whether any deference should be paid to an issuing magistrate's determination of probable cause in circumstances in which the reviewing court expunges information from a search-warrant affidavit after the fact. *See Dessesaure*, 429 F.3d at 368 n.8. Here, as in *Dessesaure*, I have given the defendant the benefit of the rule favorable to him and have not relied on any presumption in favor of the correctness of the decision to issue the warrant based on the Ryder affidavit as originally presented. *See id*.

For the reasons that follow, I conclude that (i) the defendant fails to demonstrate that Ryder unlawfully obtained information regarding the marijuana patch at 923 West Road, (ii) alternatively, even if the marijuana evidence were expunged from the affidavit, the affidavit would still convey probable cause for the issuance of the requested search warrant, and, (iii) alternatively, the government properly invokes the *Leon* good-faith exception. Accordingly, I recommend that the Motion be denied.

### A. Whether Agents Encroached on Curtilage of Residence

At hearing, the defendant's counsel contended that (i) a comparison of the Ryder and Quatrano photographs demonstrates that Ryder was standing at a more direct angle to the marijuana patch than Quatrano did, to the right of where Quatrano stood, (ii) this would have placed Ryder inside the cleared area surrounding the residence, (iii) Ryder therefore encroached on the curtilage of the residence without a warrant, and, (iv) accordingly, the information regarding marijuana in the Ryder affidavit must be excised.

Counsel for the government relied on Ryder's testimony that he was deep in the woods, not within the curtilage of the residence, when he made the observations and took the photograph at issue. Counsel argued that, regardless of whether Ryder was standing to the left or the right of where Quatrano stood, the defense had failed to cast doubt on Ryder's testimony that he was standing in the woods well back from the cleared area, employing the zoom feature on his cell phone camera.

The First Circuit has observed:

The Fourth Amendment protects persons from warrantless arrest inside their homes or other places where they have a reasonable expectation of privacy. One such place is the curtilage of the home. . . .

When determining whether a given location falls within the home's curtilage, we look to whether it is so intimately tied to the home itself that it should be placed

under the home's umbrella of Fourth Amendment protection. The Supreme Court has identified four specific criteria to guide the analysis:

[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Brown*, 510 F.3d 57, 64-65 (1st Cir. 2007) (citations and internal quotation marks omitted). The curtilage does not include so-called "open fields," over which police may trespass "and then use that constitutionally permissible trespass to peer into a curtilage without violating the Fourth Amendment." *Pew v. Scopino*, 904 F. Supp. 18, 24 (D. Me. 1995).

As the government observes, *see* Objection at 7, "open fields" need be neither "open" nor "fields": a woods qualifies as "open fields" for these purposes, *see, e.g., Oliver v. United States*, 466 U.S. 170, 179 n.10 (1984) ("The dissent conceives of open fields as bustling with private activity as diverse as lovers' trysts and worship services. But in most instances police will disturb no one when they enter upon open fields. These fields, by their very character as open and unoccupied, are unlikely to provide the setting for activities whose privacy is sought to be protected by the Fourth Amendment. One need think only of the vast expanse of some western ranches or of the undeveloped woods of the Northwest to see the unreality of the dissent's conception.") (citation omitted); *United States v. Shroyer*, No. CR-3-97-029, 1998 WL 1585819, at *3 (S.D. Ohio May 27, 1998) ("[T]he Defendant's Fourth Amendment rights were not violated by the seizure of marijuana plants from any fields, cornfields and woods which may have belonged to him, since they were open fields, rather than being within the curtilage of the Defendant's house. The protections of the Fourth Amendment extend only to a house and its curtilage, and not to open fields.").

The defendant does not contest that the woods behind the cleared area at 923 West Street constituted "open fields." Rather, he argues that Ryder unconstitutionally encroached on the curtilage of the property – the cleared area surrounded by boulders – to obtain information and photographs concerning the marijuana patch. Nonetheless, as the government rejoins, the defendant's evidence does not account for the zoom feature on Ryder's camera. Consistent with Ryder's testimony, the photograph marked as Gov't Exh. 3 appears on its face to have been taken from the woods ringing the curtilage of the property: a tree trunk and a large rock, or boulder, appear in the left foreground. *See* Gov't Exh. 3. While there are no trees or boulders in the forefront of Ryder's second photograph, marked as Df't Exh. 3, he explained that he zoomed in more closely to take that photograph. *See* Df't Exh. 3. Tellingly, Quatrano did not state that, when he took the photographs marked as Df't Exhs. 1 and 2 using a regular small camera, he used a zoom feature.

The defendant falls short of demonstrating that the information contained in the Ryder affidavit concerning Ryder's observation on August 12, 2010, of a marijuana patch was unlawfully obtained by means of intrusion into the curtilage of 923 West Road.

### B. Whether Affidavit Conveys Probable Cause With Information Excised

Even assuming *arguendo* that the information regarding the marijuana patch was illegally obtained and, hence, must be excised from the Ryder affidavit, I conclude that the Ryder affidavit confers probable cause to search the premises at 923 West Road for evidence of drug trafficking.

The defendant contends that, with the marijuana information excised, the Ryder affidavit fails to convey probable cause for the issuance of the search warrant because it contains no information about the reliability of CC, CS-1, or CS-2. *See* Motion at 5-6. At hearing, his

counsel elaborated that the affidavit is devoid of any indication that any of the informants had supplied information that had been corroborated or proven reliable in the past. Counsel for the government rejoined that, even with the marijuana information excised, the Ryder affidavit conveyed probable cause for the issuance of the warrant given that the three informants provided consistent information about Oxycodone trafficking, the identities and bases of knowledge of all three informants was known, the informants provided information against interest and cross-corroborated each other, and investigating agents corroborated at least some of their information, as well. The government has the better argument.

As the First Circuit has observed, an affiant need not necessarily assess (or otherwise vouch for) the credibility of informants to demonstrate probable cause for issuance of a warrant. *See, e.g., Schaefer*, 87 F.3d at 566 ("[A]n informant's tales need not invariably be buttressed by extensive encomia to his veracity or detailed discussions of the source of his knowledge. While an informant's truthfulness and basis of knowledge are highly relevant in determining the value of his report, the [Supreme] Court has cautioned that these elements should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case.") (citation and internal quotation marks omitted); *see also, e.g., United States v. Spinosa*, 982 F.2d 620, 626 (1st Cir. 1992) ("The affidavit must be viewed in its entirety, and must be given a common-sense and realistic, rather than a hypertechnical interpretation.") (citations and internal quotation marks omitted).

Informants' credibility can be established in multiple ways, including:

1.     Consistency among independent reports. *See, e.g., Schaefer*, 87 F.3d at 566 ("Courts often have held that consistency between the reports of two independent informants helps to validate both accounts.").

2.	Declarations against penal interest.  *See, e.g., id.* ("The fact that an informant's statements are against his or her penal interest adds credibility to the informant's report.").

3.	Consistency with information provided by "ordinary citizens" (such as complaints by neighbors that an individual was cultivating marijuana) – a type of report that enjoys "special stature since information provided by ordinary citizens has particular value in the probable cause equation." *Id.*

4.	Corroboration by external data.  *See, e.g., id.* at 567 ("The record contains several external data (i) confirming the identities and predilections of Crawford, Spellman, and other growers in the group, (ii) pinning down Crawford's and Spellman's involvement with cannabis cultivation, and (iii) demonstrating the group's access to marijuana plants that were being grown indoors.") (footnote omitted).

5.	Self-authentication "through the very specificity and detail with which [an affidavit] relates the informant's first-hand description of the place to be searched[.]"  *United States v. Zayas-Diaz*, 95 F.3d 105, 111 (1st Cir. 1996).[7]

In this case, as the government argues, *see* Objection at 10-13, the reliability of CC, CS-1, and CS-2 is established in myriad ways, as a result of which the combination of their information and MDEA agents' investigations supplies probable cause to believe that evidence of drug trafficking, specifically, trafficking in the prescription medications Oxycodone and Percocet, will be found at 923 West Road.

---

[7] "Historically, confidential informants have been treated as the least credible source of information about the commission of crimes not only because informants enjoy anonymity, but also because they are often criminals, drug addicts, or even pathological liars." *United States v. Taylor*, 774 F. Supp. 41, 42 (D. Me. 1991) (citation and internal quotation marks omitted).  "Although indispensable, confidential informants are generally regarded as less reliable than ordinary citizens, victims, or law enforcement officers." *Id.*  Nonetheless, the reliability of the reports even of confidential informants can be demonstrated to a reviewing magistrate in a number of possible ways.  *See id.* at 42-43.

As an initial matter, the affidavit makes clear that the identities of CC, CS-1, and CS-2 were known to MDEA agents, who had spoken to them and run criminal checks on them, *see* Ryder Aff. § III, ¶¶ 3, 5. An informant's information is considered more reliable if the police know his or her identity and can hold him or her accountable if information proves inaccurate or false. *See, e.g., United States v. Brown*, 500 F.3d 48, 54 (1st Cir. 2007).

Second, the affidavit indicates that CC and CS-1 possessed first-hand knowledge of the reported drug trafficking. CC stated that he/she had met Bob and Curtis Simons in a bar from which they sold prescription medication, had been to their residence in Belgrade, for which he/she provided directions leading to 923 West Road, and had observed them collect money from a male in an apartment building complex behind Target in Augusta. *See* Ryder Aff. § III, ¶¶ 3(a)-(b), (e). CS-1 stated that on one occasion he/she had been to his/her drug dealer's supplier's residence in Belgrade, for which he/she provided directions leading to 923 West Road, where he/she had seen approximately 10,000 pills on a tray. *See id.* ¶¶ 5(a)(i), (v). "The credibility of an informant is enhanced to the extent he has provided information that indicates first-hand knowledge." *United States v. Barnard*, 299 F.3d 90, 93 (1st Cir. 2002).

Third, CS-1 and CS-2 provided information against interest, having acknowledged their involvement in the acquisition of controlled substances, *see, e.g., Schaefer*, 87 F.3d at 566, and CC was a concerned citizen, whose report enjoyed "special stature since information provided by ordinary citizens has particular value in the probable cause equation[,]" *id. See also, e.g., United States v. Scalia*, 993 F.2d 984, 987 (1st Cir. 1993) ("In the absence of a prior record of reliability, we have recognized that, where the informant was not a professional but a private citizen with no known criminal record or other criminal contacts, who came forward on his own, the informant's story may be more easily accepted. Since there is no evidence that the informant who came to

MacMaster either had a criminal record, or was suspected of current criminal activity, a neutral judicial officer fairly could find that the informant was a 'private citizen' who volunteered the information to MacMaster.") (citations, italics and internal punctuation omitted).

Fourth, the affidavit states that none of the informants had pending criminal charges and that all of them were motivated by a desire to assist law enforcement and, in the case of CS-1, to attempt to remain drug-free. *See* Ryder Aff. § III, ¶¶ 3(g), 5(a)(viii)-(ix), 5(b)(vii)-(viii). None were said to be motivated by promises of money, favorable consideration on a pending charge, or any other promised personal benefit. *See id*.

Fifth, in certain respects, the informants cross-corroborated each other's information. CC and CS-1 each gave a description of, and directions to, 923 West Road. *See id*. ¶¶ 3(b), 5(a)(i). CC and CS-1 both indicated that the occupant(s) of 923 West Road made regular trips to Florida to obtain prescription drugs for further distribution. *See id*. ¶¶ 3(d), (f), 5(a)(ii). CS-1 and CS-2 both described the involvement of "Kirk," a male from Augusta. *See id*. ¶¶ 5(a)(vi), 5(b). *See also, e.g., Schaefer*, 87 F.3d at 566 (consistency between the reports of two independent informants helps to validate both accounts).

Finally, agents corroborated various aspects of the informants' reports, including the location of the trailer at 923 West Road, the identification of Robert Simon as someone with a drug-related criminal history, the fact that the phone number provided by CC for Bob was that of Simon's wife, and the presence at 923 West Road of a vehicle consistent with that that described by CC and CS-1. *See* Ryder Aff. § III, ¶¶ 3(b), (f), 5(a)(i), (iv), 7-10.

For these reasons, even with the marijuana information expunged, the Ryder affidavit supplies sufficient reliable information of the involvement of the occupants of 923 West Road in a prescription pill trafficking operation to confer probable cause for the issuance of a warrant to

search that premises for drug trafficking evidence. It follows that, with the Ryder affidavit, including the marijuana observation information, intact, the affidavit likewise conveys probable cause for the search, as the Maine District Court judge supportably found.

## C. *Leon* Good-Faith Exception

The finding that the warrant to search 923 West Road is supported by probable cause, with or without the excision of the marijuana information, is dispositive of the defendant's motion to suppress. However, even assuming *arguendo* that there were no substantial basis for concluding that probable cause existed, I would reach the same result based on application of the *Leon* good-faith exception, pursuant to which "[e]vidence seized in violation of the Fourth Amendment is admissible in court if the government placed an objectively reasonable reliance on a neutral and detached magistrate judge's incorrect probable cause determination." *United States v. Crosby,* 106 F. Supp.2d 53, 58 (D. Me. 2000), *aff'd*, 24 Fed. Appx. 7 (1st Cir. 2001) (citation and internal quotation marks omitted).

The *Leon* exception is itself subject to exceptions:

> There are four exclusions to the *Leon* good-faith exception: (1) when the magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his detached and neutral judicial role; (3) where the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where a warrant is so facially deficient – i.e. in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid.

*United States v. Owens*, 167 F.3d 739, 745 (1st Cir. 1999) (citation and internal punctuation omitted). There is no evidence that any of the four exclusions applies. Hence, in the alternative, the Motion should be denied on the basis of the government's successful invocation of the *Leon* good-faith exception.

### III. Conclusion

For the foregoing reasons, I recommend that Maguire's motion to suppress be **DENIED**.

<u>*NOTICE*</u>

 *A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

 *Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 28th day of February, 2012.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge
